175 P.3d 1050 (2008)
TWIN BRIDGE MARINE PARK, L.L.C., and Ken Youngsman (Ken Youngsman and Associates), Respondents,
v.
STATE of Washington, DEPARTMENT OF ECOLOGY, Petitioner.
No. 78462-1.
Supreme Court of Washington, En Banc.
Argued March 22, 2007.
Decided January 24, 2008.
*1051 Thomas J. Young, Attorney General's Office, Ecology Division, Jay Douglas Geck, Office of the Attorney General, Olympia, WA, for Petitioner.
Craig Douglas Magnusson, Magnusson Law Office PS, Bellevue, WA, John Todd Henry, Oles Morrison Rinker & Baker LLP, Seattle, WA, for Respondents.
Kristopher Ian Tefft, Association of Washington Business, Olympia, WA, Amicus Curiae on behalf of Association of Washington Business.
Timothy M. Harris, Andrew C. Cook, Julie M. Sund, Building Industry Association of Washington, Olympia, WA, Amicus Curiae on behalf of Building Industry Association of Washington.
J.M. JOHNSON, J.
¶ 1 While this case involves a protracted dispute between the parties, Department of Ecology and Twin Bridge Marina, the greater underlying issue is a dispute over regulatory authority between Ecology and Skagit County (County). Twin Bridge is a drystorage marina that has been properly permitted by local, state, and federal agencies after years of litigation. At argument, Ecology conceded there were no continuing environmental concerns. However, development of Twin Bridge's property has exacerbated interpretive differences between these two powerful and competing governmental entities. The Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW, defines state and local authority to regulate. When disagreements over property development arise between these two entities that exercise regulatory powers under the SMA, private citizens must not be forced to choose between conflicting edicts.
¶ 2 Where Ecology has reasonable notice of a final land use decision by the local permitting authority, it must pursue collateral attack of that decision through the Land Use Petition Act (LUPA), chapter 36.70C RCW. This is a well established principle of Washington law that gives closure and clarity to private property owners who wish to develop their land and to interested citizens. In the current case, Ecology's disagreement with the County over county permits cannot be visited on Twin Bridge, which properly relied on the County's final land use decision. Ecology had sufficient notice to resolve any dispute with the County in court, including an actual challenge filed by Anacortes under LUPA, but chose not to participate. We affirm both the trial court and the Court of Appeals.

FACTS[1]
¶ 3 Twin Bridge owns an 11 acre piece of property in Skagit County near the Swinomish Channel. In 1975, the County approved a final environmental impact statement (FE IS) for a proposal to build a 960 square foot office and 4,000 square foot warehouse *1052 on the property, which would have included marine facilities. Administrative Record (AR) Ex. R-1. In 1982, Twin Bridge obtained two shoreline substantial development permits from the County. There has been much confusion at the Shorelines Hearings Board (Board) and trial court level regarding the correct characterization of these two permits. Clerk's Papers (CP) at 172, 192 (permits are titled as "shoreline substantial development/conditional use"). We accept the superior court and Court of Appeals determination that the primary nature of the permits was substantial development.[2]
¶ 4 Permit 7-82 (AR Ex. R-3) allowed for the placement of approximately 90,000 yards of landfill on the site. Permit 15-86 (AR Ex. R-6) allowed for the hydraulic dredging of approximately 40,000 yards of material.
¶ 5 Twin Bridge decided to convert the business into a dry-storage marina facility. The proposed facility was a dry-stack marina with a 350 boat uplands storage capacity, including buildings, a reinforced concrete pad, and a large forklift for moving boats from the water to the storage area. The County issued a FEIS addendum in 2000, modifying the 1975 FEIS, and determined the revised dry-land marina development was "insignificant and does not have a probable significant adverse impact on the environment." AR Ex. R-40. The County then issued two amended building permits for the project, one of which allowed for a building approximately 58,000 square feet. The city of Anacortes appealed the County's issuance of building permits under LUPA, but Ecology did not intervene or join the appeal, even though it had notice of the development and challenge.[3]
¶ 6 When construction began pursuant to the permits, Ecology issued a stop work order and ordered Twin Bridge to obtain a new substantial development shoreline permit. Twin Bridge did not stop work, and Ecology issued a $17,000 penalty. Twin Bridge appealed to the Board. At approximately the same time, the Skagit County hearing examiner suspended the two amended building permits on the grounds the County had reevaluated the project and decided to require a new substantial development permit. Twin Bridge then stopped work at the site.
¶ 7 Twin Bridge applied to the County for a new shoreline substantial development permit, which authorized the site as a marina with the related improvements. Ecology and Twin Bridge reached a settlement whereby Ecology withdrew the penalty.[4] Twin Bridge also reached a separate agreement with Skagit County and with the city of Anacortes in the LUPA challenge. The County, upon the resolution of these outstanding concerns, reinstated the two suspended building permits. The County then sent a copy of this *1053 agreement reinstating permits to Ecology, which did not respond. Ecology did not file a LUPA petition or otherwise appeal, the reinstatement of the building permits.
¶ 8 Twin Bridge resumed construction at the site. As agreed, the County also processed Twin Bridge's application for the new shoreline development permit for construction authorized in the reinstated building permits. The final shoreline permit that resulted incorporated local,, state, and federal permits for the site. However, Ecology refused to recognize the county permits, issued a second penalty of $17,000, and reinstated the earlier penalty of $17,000, for a total of $34,000 in penalties.
¶ 9 Twin Bridge completed construction on the marina pursuant to the County-issued building permits, received approval for its occupancy and operation from the County, and opened for business. Ecology then issued a third penalty against Twin Bridge for $25,000 and ordered the marina to cease and desist all operations until a new shoreline permit authorizing use and construction of the marina was obtained. Twin Bridge appealed the penalties to the Board. As noted above, Ecology no longer argues to cease operation or that there is any current violation of any environmental law or regulation.

PROCEDURAL HISTORY
¶ 10 The Board held that Twin Bridge's marina constituted a new substantial development under the SMA, which required a new shoreline permit under RCW 90.58.140. This disregards the County-issued building permits, county environmental impact statement (EIS) surveys and prior substantial development permits. The Board ruled that both the upland and shoreline components of the marina fell under the SMA. Additionally, the Board ruled that Twin Bridge violated its settlement with Ecology by completing construction pending approval. The Board found that Ecology's failure to initiate a
LUPA appeal (or join in the pending appeal) did not preclude penalties. Finally the Board found that Twin Bridge's reliance on the County's preexisting permits and subsequent building permits did not relieve its obligation to pay a total of $59,000 in penalties (two $17,000 penalties and the last $25,000 imposed postcompletion). See Pet. for Review, App. B.
¶ 11 Twin Bridge appealed the Board's decision to the superior court, which reversed the Board in its entirety. First, the superior court issued findings of fact and conclusions of law after it considered additional, evidence, which included the 2003 County-issued substantial development permit. The court found that the preexisting permits were primarily substantial development permits. See CP at 428, Finding of Fact (FF) 5. The court found that the County's issuance of the subsequent building permits and the new FEIS addendum amounted to county authorization for Twin Bridge's construction of the marina.[5]
¶ 12 Additionally, the superior court held that Twin Bridge did not require any additional Ecology permit because the County's issuance of building permits necessarily included a determination that the project was already in compliance with the SMA (pursuant to the preexisting permits).[6] Finally, the court held that Ecology could not penalize projects with valid county permits without first filing a LUPA challenge. Thus, the direct imposition of penalties in this case was an invalid collateral attack on the County's decision. The Washington Court of Appeals affirmed the superior court ruling, relying largely on this court's intervening Samuel's Furniture, Inc. v. Department of Ecology, 147 Wash.2d 440, 54 P.3d 1194 (2002) case. We granted review. Twin Bridge Marine Park, LLC v. Ecology, 158 Wash.2d 1029, 152 P.3d 1033 (2007).

*1054 STANDARD OF REVIEW
¶ 13 The Administrative Procedure Act, chapter 34.05 RCW, governs judicial review of board decisions. See RCW 90.58.180(3). Additionally,
[I]n reviewing adjudicative proceedings, review by an appellate court is to be on the agency record without consideration of the findings and conclusions of the superior court. The one exception is in regard to matters where the superior court takes additional evidence[7] under RCW 34.05.562. . . . In such instances, where the information needed for review is contained in the superior court record of proceedings, not the agency record, the appellate tribunal will look to the superior court record.
Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n, 123 Wash.2d 621, 633-34, 869 P.2d 1034 (1994) (citation omitted); see also RCW 34.05.558.
¶ 14 When reviewing a board decision, " the process of applying the law to the facts . . . is a question of law and is subject to de novo review.'" Port of Seattle v. Pollution Control Hearings Board, 151 Wash.2d 568, 588, 90 P.3d 659 (2004) (quoting Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 403, 858 P.2d 494 (1993)).
¶ 15 The two controlling statutes in this case are the SMA, with its division of authority between state and local government, and LUPA, which details the process necessary to challenge final land use decisions.

ANALYSIS
A. Washington Statutory Authority
¶ 16 At issue is whether Ecology can directly impose penalties under the SMA when a project has been constructed pursuant to valid building permits issued by the County after that County complied with applicable law (including the State Environmental Policy Act (SEPA), chapter 43.21C RCW). We hold that Ecology must challenge the valid county building permits through LUPA, as we held in Samuel's Furniture, 147 Wash.2d 440, 54 P.3d 1194. In this case, the two County-issued building permits were based on preexisting substantial development permits and a related FEIS, together with a later FEIS addendum. Those permits are no longer challenged by Ecology. Thus, the fine amount of $59,000 remains the only issue in controversy.
1. Substantial Development Permits
¶ 17 Under the SMA, counties develop shoreline management plans and Ecology approves the county plan. Then, applications for actual permits are made to the counties (local or other governments) who determine compliance with their local plans. It is worthy of note here that while the County did comply with SEPA at each stage, and its decisions were supported by a FEIS, and later addenda, Ecology never undertook SEPA analysis.
¶ 18 RCW 90.58.140(10) does allow Ecology to review conditional use permits or variances issued by the local permitting authority.[8]See also WAC 173-27-200. Ecology may attach provisions to such conditional use permits and may penalize violations. See RCW 90.58.210; WAC 173-27-280(1). However, no similar statute gives Ecology direct review authority for local government substantial development permits, and Ecology cannot issue fines for complying with a valid county shoreline permit. This marks the legislature's clear division of authority between state and local government. See RCW 90.58.140(3) ("The administration of the [permitting] system so established shall be performed *1055 exclusively by the local government." (emphasis added)).
¶ 19 Even Twin Bridge's county permits for the original business were primarily for substantial development as defined by the SMA.[9]See former RCW 90.58.030(3)(e) (1996). Tellingly, the Twin Bridge dry-storage marina is currently permitted on local, state, and federal levels without a new conditional use permit. Rather, Twin Bridge was eventually issued a substantial development permit from the County. In light of these statutory provisions, the SMA does not give Ecology plenary power to set aside the County's analysis of its own SMA plan when issuing substantial development permits.[10]
¶ 20 Another factor, the Skagit County Shoreline Master Plan (SMP), also requires the holding that the preexisting permits were primarily substantial development. For example, permit 15-86 was issued under section 7.07 of the SMP (among others), which is titled "Marinas and Launch Ramps." Under section 7.07, in the rural shoreline designation, the SMP does not require a conditional use permit for a marina, it states "Marinas and boat launch ramps are permitted subject to the General and Tabular Regulations." AR Ex. R-102 at 7-40. Compare this language with the rural residential shoreline designation, which explicitly states "Marinas are permitted as a conditional use subject to the General and Tabular Regulations." Id.; see also CP at 84, 88 (designating Twin Bridge as a "rural" classification within the SMP). The, SMP has been in place since 1976 and was approved by Ecology as required by the SMA. Since a conditional permit was never required, then Twin Bridge cannot be held in violation of the SMP or the SMA.
¶ 21 We have held that the SMA does not give Ecology the authority to directly review the local government's decision to issue a substantial development permit. This court has previously said:
Under the SMA, Ecology's primary role is to review and approve SMPs. RCW 90.58.080. In this sense, it is "reviewing" local government action. However, once an SMP has been approved, the SMA specifically grants local governments the exclusive power to administer the permit system. RCW 90.58.140(3). Nowhere in the statute is Ecology explicitly given the right to directly review a local government's decision regarding a substantial development permit.
Samuel's Furniture, 147 Wash.2d at 455, 54 P.3d 1194. Ecology argues that the dry marina exceeded the impact foreseen by the original permits. It is counterintuitive that a dry-storage facility would have more shoreline impact than a water marina. Further, the County had taken all the impacts into consideration because it had the benefit of *1056 two EIS's. In contrast, Ecology never performed its own environmental impact analysis and did not even substantively review Twin Bridge's later information submitted to the County for the 2000 addendum. CP at 389-90. Thus, Ecology could not have a "better" opinion on whether the expanded project would harm the ecosystem or even enough record for an informed opinion. The County, which commissioned the environmental impact statementsone in 1976 and then a recent supplement in 2000and was involved in the city of Anacortes LUPA challenge, had the best available information.[11]
¶ 22 The SMA gives local government the exclusive permitting authority and the County was in the best position to make this decision. Here, the County's characterization of the permits must control, especially when the County is the original permitting authority and is the only government agency to have performed environmental impact analysis on the disputed project.
2. Building Permits
¶ 23 Ecology's claimed basis for issuing the penalties is RCW 90.58.210(2), (3), which allows it to fine individuals who develop property in the shoreline area without proper permits. Here, Twin Bridge entered into an agreement with Ecology to rescind the fines if it would apply for a new County-issued substantial development permit. See AR Ex. R-80. Twin Bridge did resume work, but only after the County's reinstatement of the building permits, which implicitly and necessarily held that additional shoreline permits were not required. Resp'ts' Suppl. Br. at 10. Ecology had sufficient notice of this decision if it wished to appeal. Again, it did not.
¶ 24 Ecology argues that Twin Bridge's reliance on the county building permits was misplaced and Ecology should collect substantial fines.[12] Ecology's reasoning is not persuasive. The settlement specifically states that Twin Bridge must pursue a new County-issued substantial development permit "in good faith" and "shall not resume work on the site until all required federal, state, and local permits have been obtained." See AR Ex. R-80.
¶ 25 Twin Bridge correctly argues that the County-issued building permits implicitly demonstrate that the permits it received were sufficient. See RCW 90.58.140. The County could not issue a building permit if the permits were in violation of the SMA or of the County's SMP. See WAC 173-27-140. Ipso facto, the County found that Twin Bridge's development was in total compliance with the existing law. If Ecology determined that the County's final land use decision (building permits) was improperly issued, then the agency is required to file an appeal under LUPA. We agree with the superior court conclusion that Twin Bridge could reasonably rely on the County's authority once a final land use decision was given and permits issued. See CP at 425.
¶ 26 In light of the statutory provisions, supra, the County's reinstatement of building permits signaled to Twin Bridge that it had obtained all permits necessary to begin construction.[13] Moreover, the Court of Appeals in this case affirmed that the County had exclusive authority to determine whether additional permits were needed. The court said in relevant part: "A local government's *1057 exclusive authority to administer the permit system necessarily means that the local government has the authority to determine that a shoreline project is consistent with already existing shoreline permits and that further shoreline permits are not necessary." Twin Bridge Marine Park, LLC v. Dep't of Ecology, 130 Wash.App. 730, 740, 125 P.3d 155 (2005).
¶ 27 The Board erroneously relied upon a Court of Appeals decision in Samuel's Furniture, which this court subsequently overturned. CP at 27. In. Samuel's Furniture, we held that Ecology must bring a collateral attack on a final local land use decision through LUPA. See. Samuel's Furniture, 147 Wash.2d at 440, 54 P.3d 1194.
¶ 28 The settlement agreement with Ecology required Twin Bridge to obtain appropriate permits before resuming construction. The appellate court correctly held that "the County made the determination that its [Twin Bridge] development was consistent with the County's shoreline master plan and Twin Bridge's existing shoreline permits when it issued the two building permits." Twin Bridge, 130 Wash.App. at 740, 125 P.3d 155 (citing Samuel's Furniture, 147 Wash.2d at 450, 54 P.3d 1194). Therefore, Twin Bridge was justified in relying on reissue of its building permits.[14]
B. Washington Case Law
¶ 29 The central holding in Samuel's Furniture applies where the local government authority disagrees with Ecology's determination of the shoreline boundary. Here, we are confronted with a related issue regarding which permits are required for development within the shoreline. We hold that Samuel's Furniture was correctly applied to the instant facts by both the trial court and appellate court. The reasoning of that case also applies.
¶ 30 In Samuel's Furniture, 147 Wash.2d at 440, 54 P.3d 1194, we considered a jurisdictional dispute between Ecology and the city of Ferndale. We held that Ecology is required to file a LUPA challenge to a local government's issuance of a permit when the local government has independently determined that the project is not within the shoreline. Id. at 444, 54 P.3d 1194. We held Ecology "cannot collaterally challenge the local government's determination that the project is not within the shoreline jurisdiction by bringing independent enforcement actions against the property owner or developer." Id, at 463, 54 P.3d 1194. This definition of Ecology's regulatory power was central in Samuel's Furniture. A discussion of the facts and pertinent reasoning from that case is appropriate to guide future cases.
¶ 31 The city had determined that the business did not require a shoreline permit for expansion of its store because it would not encroach on the shoreline jurisdiction. Id. at 444, 54 P.3d 1194. Acting under this analysis, the city issued a fill and grade permit along with a building permit. Id. at 445, 54 P.3d 1194. In contrast, Ecology asserted that the project was within the shoreline area and required a substantial development permit. Id. As in Twin Bridge, the city had issued a stop work order, but after reviewing its SMP it determined the expansion was not within the shoreline jurisdiction and reinstated the building permit. Id. Ecology disagreed with this decision and informed Samuel's Furniture that it would be unable to obtain a substantial development permit. Id. at 445-46, 54 P.3d 1194.
¶ 32 Samuel's. Furniture appealed and the trial court granted its motion for summary judgment. Id. at 447, 54 P.3d 1194. Division One of the Court of Appeals reversed the trial court, holding that the SMA gave Ecology the authority to review local government decisions pursuant to RCW 90.58.050, and a local government decision was not final for the purposes of LUPA. Samuel's Furniture, Inc. v. Dep't of Ecology, 105 Wash.App. 278, 285, 19 P.3d 474 (2001). This court *1058 granted review and reversed the Court of Appeals.
¶ 33 This court held that "[b]ecause local governments are given the exclusive authority to administer the permit system, RCW 90.58.140(3), their permit decisions may also determine whether development is within the jurisdiction of the SMA." Samuel's Furniture, 147 Wash.2d at 457, 54 P.3d 1194. In Samuel's Furniture, the local permitting authority was the City. Although we noted that Ecology may disagree with local government, "Ecology [must] follow the proper procedures when challenging that decision." Id. at 456 n. 14, 54 P.3d 1194. The procedures are specified in LUPA.
¶ 34 Ecology's role and that of the local government authority can be fairly reconciled within the strictures of both the SMA and LUPA. This court held that
[b]y filing a LUPA petition challenging a local government decision to allow a land use action that is in conflict with the SMP or the SMA, Ecology would be enforcing the provisions of the SMA. Requiring Ecology to follow the procedures established in LUPA merely provides structure and finality to the enforcement process.
Id. at 457, 54 P.3d 1194. We further held that Ecology must use LUPA to challenge the city decision because the SMA does not provide "Ecology with enforcement authority under RCW 90,58.210[to] enable Ecology to reverse local government decisions." Id. at 456, 54 P.3d 1194.
¶ 35 The instant case is only slightly different. In this case, the County reissued the building permits for development within the shoreline area, necessarily deciding that the new activities were allowed by the County's SMP and implemented ordinances. We hold that the permitting decision was exclusively the County's (absent a LUPA appeal) and Ecology cannot directly enforce its own differing interpretation of a county SMP.
¶ 36 Ecology argues that Samuel's Furniture is not applicable because this property is within the shoreline boundary. However, we find Samuel's Furniture persuasive because of the extensive analysis of the roles the legislature provided to Ecology and local government under the SMA. See Resp'ts' Suppl, Br. at 3, 11. Under the SMA, the County and not Ecology makes the threshold determination of what shoreline substantial development permits are required under the County's SMP.
C. A LUPA Appeal was the Appropriate Procedure to Challenge the Twin Bridge Permits
¶ 37 The requirement that Ecology file a LUPA challenge concerning the disputed building permits is also consistent with prior holdings of this court that favor finality in land use decisions. This policy is also strongly expressed in Washington law. For example, developers are protected from changes in the laws that occur after the filing date of a building permit application. "Washington's doctrine of vested rights entitles developers to have a land development proposal processed under the regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations." Erickson & Assocs. v. McLerran, 123 Wash.2d 864, 867-68, 872 P.2d 1090 (1994).
¶ 38 Under LUPA, no "person" is exempt from its provisions when challenging a final land use decision by a local authority having jurisdiction. Ch. 36.70C RCW. A "person" includes Ecology. RCW 36.70C.020(3). A final land use decision is a "final determination by a local jurisdiction's body or officer" regarding the improvement or development of real property. RCW 36.70C.020(1).[15] The crux of LUPA is that persons and agencies who oppose a final land use decision made by *1059 the local permitting authority must appeal that decision within 21 days. RCW 36.70C.040(3).
¶ 39 This court has previously analyzed LUPA and its stated purpose of establishing uniform and expedited judicial review of local decisions. See, e.g., Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 4 P.3d 123 (2000) (a challenge to a Chelan County decision concerning residential development permits under the Growth Management Act, chapter 36.70A RCW, must be brought under LUPA); Skamania County v. Columbia River Gorge Comm'n, 144 Wash.2d 30, 26 P.3d 241 (2001) (construing a federal act, 16 U.S.C. § 544m(a), no collateral attack on a local final land use decision can be made when no timely appeal is filed); Chelan County v. Nykreim, 146 Wash.2d 904, 52 P.3d 1 (2002) (declaratory action by county overturning a prior boundary line adjustment must be filed through LUPA).
¶ 40 In the current case, LUPA plainly applies because the County was the local permitting authority within the statute. Ecology had notice of the County's reinstating the building permits and chose not to challenge it. We have held in other context that "approval of the rezone became valid once the opportunity to challenge it passed.", Wenatchee Sportsmen, 141 Wash.2d at 181, 4 P.3d 123.
¶ 41 Here, Ecology had reasonable notice, did not appeal, and the building permits became valid and the right to construct vested due to Ecology's inaction. In another decision in this court, the Columbia River Gorge Commission echoed Ecology's claim of independent enforcement authority. Skamania County, 144 Wash.2d at 44, 26 P.3d 241 (asserting "plenary powers under the Act to take whatever actions that it determines are necessary, . to ensure the Act . . . [is] not violated."). This court roundly rejected the claim to exempt the commission from LUPA appeal time frames. Id. at 57, 26 P.3d 241. Finally, Nykreim, 146 Wash.2d at 933, 52 P.3d 1, applied the LUPA time frame to Chelan County's attempted nullification of its own determination of a boundary line adjustment and subsequent permits. Thus, an agency cannot even revoke its own final land use decision unless it has appealed in the LUPA allotted time frame. Id. This holding emphasizes the value of finalizing land use decisions.
¶ 42 In light of these LUPA decisions, we reaffirm that Samuel's Furniture offers protection to private property owners and finality to the decisions of local government. Samuel's Furniture was not a decision solely regarding one city's shoreline boundary, but rather squarely "present[ed] the intersection of the SMA and LUPA." 147 Wash.2d at 448, 54 P.3d 1194. LUPA's underlying rationale is that prolonged uncertainty is manifestly unfair to land owners who seek a final determination of their property's status. See Resp'ts' Answer at 9. The Court of Appeals stated this public policy:
Requiring Ecology to file a LUPA petition to contest a local government's decision to allow a land use action would also serve the State's "`strong public policy favoring administrative finality in land use decisions.'" Samuel's Furniture, 147 Wash.2d at 458, 54 P.3d 1194 (quoting Skamania County v. Columbia River Gorge Comm'n, 144 Wash.2d 30, 48, 26 P.3d 241 (2001)). Blanket enforcement authority by Ecology would conflict with the public policy favoring administrative finality, as a developer could be subject to enforcement by Ecology while relying in good faith on a local government's determination. Samuel's Furniture, 147 Wash.2d at 458, 54 P.3d 1194.
Twin Bridge, 130 Wash.App. at 741, 125 P.3d 155. Here, the County's reinstatement of building permits after an addendum to the EIS was a final land use decision. Ecology's position in the instant case is similar to the position it unsuccessfully argued in Samuel's Furniture, 147 Wash.2d at 459, 54 P.3d 1194 ("Ecology's interpretation of the SMA would leave land owners and developers unable to rely on local government decisionsprecisely the evil for which LUPA was enacted to prevent."). Requiring Ecology to file a LUPA challenge, pursuant to reasonable notice of the building permits, allows Ecology to challenge an improper permit decision. Ecology merely is required to comply with LUPA procedures.
*1060 ¶ 43 Alternatively, Ecology argues that the LUPA argument from Samuel's Furniture is misapplied to the instant case because Ecology was challenging the adequacy of the underlying SMA permits. See RCW 90.58.140(10).[16] This is incorrect because the County-issued building permits are a final land use decision authorized by the preexisting substantial development permits. The County-issued building permits did not modify the shoreline permits; they are development decisions incorporating the prior permits (and accompanying environmental analyses). See RCW 36.70C.020(1) (defining a final land use decision). These development permit decisions are left to the County's exclusive discretion, unless Ecology brings a LUPA challenge. See Samuel's Furniture, 147 Wash.2d at 458, 54 P.3d 1194 ("The blanket enforcement authority sought by Ecology is in sharp contrast to the policy favoring finality in land use decisions.").
¶ 44 In sum, Skagit County made the determination that Twin Bridge's development was consistent with the County's SMP and Twin Bridge's existing shoreline permits when it issued the building permits. The disputed permits were substantial development permits and Ecology had no authority to issue fines based on compliance with a valid county permit. Moreover, once the building permits were reinstated, this was a final land use decision by the local permitting authority, and Ecology was required to file a LUPA challenge.

CONCLUSION
¶ 45 The enforcement authority the legislature provided to Ecology under the SMA does not enable Ecology "to reverse local government decisions." Samuel's Furniture,
147 Wash.2d at 456, 54 P.3d 1194. As the Court of Appeals correctly noted, if Ecology had such sweeping authority, "it would not need to appeal permit decisions to the Board under RCW 90.58.180(2) and would no longer share enforcement authority with local governments." Twin Bridge, 130 Wash.App. at 741, 125 P.3d 155 (citing Samuel's Furniture, 147 Wash.2d at 456, 54 P.3d 1194).
¶ 46 Here, after completing a project under permits properly issued by Skagit County, Twin Bridge was fined a total of $59,000.[17] We agree with the Court of Appeals that "[d]irectly imposing a penalty [for building permits] through RCW 90.58210 would constitute a collateral attack on a local government decision at odds with the policy of cooperation contemplated in RCW 90.58.050." Id. at 743, 125 P.3d 155. Ecology's disagreement with the local permitting authority should have been resolved through LUPA and not through a series of penalties assessed against a private party. We affirm the Court of Appeals and trial court decisions dismissing Ecology's fines and orders.
WE CONCUR: ALEXANDER, C.J., C. JOHNSON, SANDERS, JJ. and BRIDGE, J.P.T.
FAIRHURST, J. (concurring).
¶ 47 Because of our decision in Samuel's Furniture, Inc. v. Department of Ecology, 147 Wash.2d 440, 54 P.3d 1194 (2002), in which we determined that the issuance " of a building permit by a local government is an implicit determination that the approved development complies with the Shoreline Management Act of 1971(SMA), chapter 90.58 RCW, I concur with the majority's determithat *1061 the Department of Ecology lacked authority to penalize Twin Bridge Marine Park, LLC for developing in compliance with the building permits issued by Skagit County (County) because Ecology failed to challenge the reinstatement of the building permits pursuant to the Land Use Petition Act (LUPA), chapter 36.70C RCW. While I agree with the result reached by the majority, I write separately because I disagree with portions of the majority's legal analysis.
I. The issuance of a building permit by a local government is an implicit determination that the approved development complies with the SMA
¶ 48 The crux of this case is whether the issuance of a building permit by a local government is an implicit determination that the approved development complies with the requirements of the SMA. A local government is legally obligated to administer its shoreline regulatory program consistent with the SMA. RCW 90.58.050. Thus, the local government is precluded from authorizing development on shorelines of the State unless "upon review the . " . development is determined to be consistent with the policy and provisions of the Shoreline Management Act and the master program." WAC 173-27-140(1). Consequently, in Samuel's Furniture, we determined that the issuance of a building permit necessarily included a determination that the proposed project was outside of the shoreline jurisdiction because the local government did not require a substantial development permit. 147 Wash.2d at 451, 54 P.3d 1194. I see no significant basis on which to distinguish the building permits in this case from the building permit in Samuel's Furniture.
¶ 49 Twin Bridge's predecessor obtained two shoreline development permits (CUP/ SDP 7-82[1] and 15-86[2]) from the County in the 1980's.[3] These permits authorized the owner to develop and use the site for a marine construction and dredging business. In 1999, Twin Bridge's predecessor applied for three building permits to allow for the construction of a dry-stack storage facility. The County issued building permits 99-1065 and 99-1226 for the project but did not require the developer to obtain a new or revised substantial development permit. The County later suspended the building permits after a hearings examiner, during an appeal of the building permits by the city of Anacortes (City), determined that a new substantial development permit was required by the SMA.[4] Twin Bridge then applied for a substantial development permit. While the application was pending, pursuant to a settlement between the County' and the City, the building permits were reinstated in February 2001.[5] Twin Bridge recommenced construction in accordance with the building permits.[6] *1062 Ecology ordered Twin Bridge to cease construction and issued the two penalties in question because it believed that a new or revised substantial development permit was required because the new development was outside of the scope of the original substantial development permits.
¶ 50 The County could not have legally issued the 1999 building permits if the proposed development was not consistent with the SMA.[7]See RCW 90.58.050; former WAC 173-27-140(1). Under the SMA, a substantial development permit is required whenever there is a proposed development of a shoreline for which the total cost or fair market value exceeds $2,500. RCW 90.58.140(2); former RCW 90.58.030(3)(e) (1996).[8] A substantial development permit must be revised whenever the developer "proposes substantive changes to the design, terms or conditions of a project from that which is approved in the permit." Former WAC 173-27-100 (1996). If the proposed changes in and of themselves constitute a substantial development, a new permit is required.[9] Former WAC 173-27-100(3). Thus, implicit in the issuance of the building permits was a determination by the County that the proposed development was consistent with the SMA, meaning that a new or revised substantial development permit was not required.[10],[11]
*1063 II. Ecology's enforcement authority under RCW 90.58.210(3) includes development on shorelines without a permit or in violation of the terms of a permit only when such development has not been authorized by a building permit
¶ 51 The underlying issue in this case is the proper relationship between local governments and Ecology in ensuring compliance with the SMA. The SMA establishes local governments as the exclusive administrators of shoreline permits but grants joint enforcement powers to local governments and Ecology.[12] Ecology cannot directly review[13] or collaterally attack the administrative decisions of a local authority. Thus, Ecology cannot directly review a substantial development permit and determine that it violates the SMA. Samuel's. Furniture, 147 Wash.2d at 445, 54 P.3d 1194. Similarly, if a local government issues a building permit after determining that the area is outside of the shoreline jurisdiction, Ecology cannot collaterally attack the building permit by threatening to penalize the developer for developing without a substantial development permit. Id. at 463, 54 P.3d 1194.
¶ 52 When Ecology does not attack a local government's administrative or enforcement decision, it may properly exert its enforcement powers.[14] As we noted in Samuel's Furniture, "Ecology's enforcement authority under RCW 90.58.210(3) is limited to situations involving development on shorelines without a permit, and where there is a violation of the permit terms." 147 Wash.2d at 457, 54 P.3d 1194. However, even when Ecology believes that substantial development is occurring on a shoreline without or in excess of a substantial development permit, Ecology may be collaterally attacking a local government's implicit administrative or enforcement decision. If the development at issue was authorized by a building permit, Ecology cannot penalize the developer for complying with the building permit. Thus, Ecology can penalize a developer for engaging in substantial development on a shoreline in violation of the SMA only when the development has not been authorized by a local authority.[15]
*1064 ¶ 53 In this case, Ecology collaterally attacked the County's decision to authorize the developments proposed by Twin Bridge. Because the County authorized the development in question by reinstating the building permits on February 12, 2001, Ecology was precluded from penalizing Twin Bridge on March 5, 2001, and July 17, 2001, for engaging in development that complied with the building permits.[16]
III. The issuance of the building permits by the County was a land use decision, which could have been appealed by Ecology under LUPA
¶ 54 If Ecology disagreed with the County's implicit determination that a new substantial development permit was not required, Ecology should have timely challenged the issuance of the building permits under LUPA.[17] If Ecology fails to file a timely LUPA petition, it cannot collaterally attack the local government's land use decision by exerting its enforcement powers against the developer. Id. at 463, 54 P.3d 1194.
¶ 55 LUPA applies in this situation because the issuance/reinstatement of a building permit is a land use decision. James v. Kitsap County, 154 Wash.2d 574, 584, 115 P.3d 286 (2005) (building permits are subject to judicial review under LUPA). LUPA is the exclusive means of judicial review of land use decisions, with a few exceptions.[18] A "`[l]and use decision'" is a "final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals." RCW 36.70C.020(1). If a decision is not timely appealed, then the initial decision is final. Once a decision is final, a person who has standing, which includes the requirement that all administrative remedies be exhausted, can file a LUPA petition in superior court.[19]See RCW 36.70C.060(2)(d).
*1065 ¶ 56 In this case, the reinstatement of the building permits on February 12, 2001, was a final land use decision by the County.[20] Regardless of whether a substantial development permit was pending with the County, the reinstatement of the building permits was a final decision that left nothing open to further dispute between the County and Twin Bridge.[21] If Ecology wished to appeal that decision, it should have exhausted its administrative remedies under the county code and then filed a timely LUPA petition.
¶ 57 As the dissent notes, requiring Ecology to comply with LUPA to challenge an implicit determination that a development complies with the SMA limits Ecology's ability to enforce the SMA. Dissent at 1067. A local government could knowingly or innocently issue a building permit authorizing development that violates the SMA. Then, Ecology would be precluded from challenging the building permit decision after 21 days expired regardless of whether Ecology was notified of the issuance of the building permit. While this presents a possible obstacle to ensuring the enforcement of the SMA, our role is to interpret the statutes as enacted by the legislature, not to rewrite the law.
¶ 58 Finally, applying LUPA to the issuance of the building permits, including the implicit decision that the proposed development complies with the SMA, does not preclude Ecology's ability to enforce compliance with the SMA. As we stated in Samuel's Furniture, "Ecology can and should disagree with a local government decision when it believes that it is in conflict with the SMA. We require only that Ecology follow the proper procedures when challenging that decision." 147 Wash.2d at 456 n. 14, 54 P.3d
OWENS, J. (dissenting).
¶ 59 This case presents the question of whether a local government's decision to issue its own building permits can limit the independent authority of the Department of Ecology to enforce compliance with an existing shoreline permit under the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW. The majority relies on an expansive interpretation of this court's holding in Samuel's Furniture, Inc. v. Department of Ecology, 147 Wash.2d 440, 54 P.3d 1194 (2002), to conclude that the issuance of two building permits by Skagit County (County) implied a land use decision under the Land Use Petition Act (LUPA), chapter 36.70C RCW, which necessarily limited Ecology's independent enforcement authority under the SMA.
¶ 60 I believe that the issuance of the building permits did not require Ecology to comply with LUPA because: the County never made a land use decision from which Ecology could appeal under LUPA; the SMA grants Ecology independent authority to enforce compliance with existing shoreline permits; and Samuel's Furniture does not effectively limit Ecology's jurisdiction to enforce the SMA. For these reasons, I respectfully dissent.
I. The Building Permits Issued by the County did not Constitute a Land Use Decision From Which Ecology Could Appeal under LUPA
¶ 61 The majority holds that the building permits issued by the. County constituted a *1066 land use decision for purposes of LUPA, as they implied a final determination that Twin Bridge's development could proceed without further compliance with the SMA. The majority concludes that Ecology was required to file a LUPA petition in order to challenge that implied decision. However, the majority fails to explain how the County's decision finally determined Twin Bridge's compliance with the SMA in order to give Ecology standing to file a LUPA petition.
¶ 62 LUPA provides the exclusive remedy for parties to seek review in superior court of land use decisions issued by a local government. RCW 36.70C.030, .040. A land use decision is defined as a "final determination" by the highest authority of the local government, "including those with authority to hear appeals." RCW 36.70C.020(1). A party must exhaust its administrative remedies, including administrative review procedures, in order to petition a land use decision. RCW 36.700.060(2)(d); see Ward v. Bd. of Skagit County Comm'rs, 86 Wash.App. 266, 271-73, 936 P.2d 42 (1997). A party has no standing to file a LUPA petition before a decision has become final. RCW 36.70C.060(2)(d).
¶ 63 The issuance of the building permits did not constitute a final determination by the County because that decision remained subject to administrative review. Soon after the County issued the building permits, the city of Anacortes appealed the building permits to the county hearings examiner.[1] A county hearing examiner is an administrative body. Ward, 86 Wash.App. at 271, 936 P.2d 42. LUPA requires parties to exhaust administrative remedies before filing a petition in superior court. RCW 36.70C.060(2)(d). Ecology would have no standing to file a LUPA petition challenging the permits because that decision remained subject to the hearing examiner's administrative review. Ward, 86 Wash.App. at 271, 936 P.2d 42 ("[A]gency action cannot be challenged on review unless all rights of administrative appeal have been exhausted.").
¶ 64 The decision to issue the building permits did not finally determine Twin Bridge's compliance with the SMA. This court has recognized that "[a] `final decision' is [o]ne which leaves nothing open to further dispute and which sets at rest cause of action between parties.'" Samuel's Furniture, 147 Wash.2d at 452, 54 P.3d 1194 (quoting Black's Law Dictionary 567 (5th ed.1979)). In this case, Twin Bridge's compliance with the SMA remained subject to multiple actions after the County issued the building permits. First, the county hearing examiner decided that Twin Bridge must obtain a new shoreline permit for its `amended development plans. The County then decided to suspend the building permits. Next, Twin Bridge applied for a new shoreline permit with the County. Twin Bridge also entered into a settlement agreement with Ecology, through which it agreed to pursue the new shoreline permit in good faith. Finally, shortly after the settlement agreement, the County reissued the building permits and continued to process the shoreline permit application.[2]
¶ 65 Ecology had no standing to file a LUPA petition as an aggrieved party before the County made a decision on Twin Bridge's shoreline permit application. RCW 36.70C.060(2). The SMA requires parties to obtain a shoreline permit for the development of shoreline property. RCW 90.58.140(2). Only the decision of whether to issue the shoreline permit could be a final determination by the County that Twin Bridge had fully, complied with the SMA. The submission of the shoreline permit application required the County to decide whether or not to grant, deny, or rescind the application. Without such a decision, the authorization to develop pursuant to the SMA remained *1067 "open to further dispute."[3]See Samuel's Furniture, 147 Wash.2d at 452, 54 P.3d 1194.
¶ 66 The SMA requires Ecology to appeal a local government's decision to grant, deny, or rescind the shoreline permit to the Shorelines Hearings Board (Board). RCW 90.58.180(2). In this case, the County simply delayed in making that final decision. Requiring Ecology to appeal the County's decision to issue the, permits in superior court before the County made a decision on the new shoreline permit would defy the jurisdiction conferred on the Board as well as LUPA's policy favoring finality in land use decisions. See Samuel's Furniture, 147 Wash.2d at 458, 54 P.3d 1194.
II. Ecology has Independent Authority to Enforce Compliance with the SMA
¶ 67 While the majority characterizes this case as a long-standing jurisdictional conflict between Ecology and the County, the facts merely describe a dispute between Ecology and a private developer. In fact, the County conferred jurisdiction upon Ecology to enforce the SMA in the first place by issuing the shoreline permits. Ecology issued its enforcement orders and penalties under that authority. Twin Bridge did not comply with Ecology's orders because it chose to rely solely on the County-issued building permits. The allocation of enforcement jurisdiction under the SMA does not permit a developer to choose which agency to obey.
¶ 68 The SMA creates independent enforcement jurisdiction in both Ecology and local governments. RCW 90.58.210(1). Either entity may assess a penalty against "[a]ny person who shall fail to conform to the terms of a permit issued under this chapter or who shall undertake development on the shorelines of the state without first obtaining any permit required under this chapter." RCW 90.58.210(2). Furthermore, Ecology may not review penalties assessed by local governments. RCW 90.58.210(4). Likewise, local governments may not review penalties assessed by Ecology. Id.
¶ 69 There is no question in this case that Twin Bridge fell within the enforcement jurisdiction of Ecology, pursuant to the shoreline permits issued by the County. Under such authority, Ecology gave express written notice to Twin Bridge's predecessor in interest that the permits only authorized the moorage and storage of equipment used for its dredging business and that any other substantial development would require a new or revised permit.[4]See Twin. Bridge Marine Park, LLC v. Dep't of Ecology, 130 Wash. App. 730, 733, 125 P.3d 155 (2005). Nonetheless, when Twin Bridge changed its development plans to construct a dry-stack storage facility, it did not apply for a new shoreline permit. As warned, Ecology ordered Twin Bridge to obtain a new shoreline permit and assessed a penalty, fully within its authority under RCW 90.58.210(2).[5]
*1068 ¶ 70 Twin Bridge sought review of Ecology's penalty assessment with the Board. See RCW 90.58.210(4). As a result of that appeal, Twin Bridge and Ecology entered into a settlement agreement through which Twin Bridge agreed to pursue a new shoreline permit application in order to avoid the penalty assessed by Ecology.[6] Before the agreement was made, the County had suspended the building permits. The County reissued the building permits only after Twin Bridge applied for the shoreline permit and agreed to pursue the permit in good faith.[7]
¶ 71 Based on these facts, the majority determines that Twin Bridge "was justified in relying on reissue of its building permits." Majority at 1057. However, Twin Bridge could not have reasonably inferred that the reissued building permits determined its compliance with the SMA while the shoreline permit application remained pending. Such reliance is plainly unjustifiable because it ignores that Twin Bridge remained subject to Ecology's independent enforcement jurisdiction. A party cannot decide for itself who may assert jurisdiction over it.
¶ 72 To require Ecology to file a LUPA petition under these facts would effectively limit Ecology's ability to enforce the SMA. Ecology must have jurisdiction under the SMA before it can enforce compliance against a party. Once the jurisdictional determination is made however, the SMA grants Ecology discretion to enforce compliance with the shoreline permit requirements. See RCW 90.58.210. The burden of challenging Ecology's enforcement authority rests with the party against whom Ecology seeks to enforce compliance. The SMA confers jurisdiction on the Board to review appeals of penalties assessed by Ecology for failure to obtain or comply with a shoreline permit. RCW 90.58.210(4).
¶ 73 The majority disregards this procedure in favor of one that requires Ecology to defend its authority in the first instance by filing a LUPA petition in superior court. In this case, the County made the initial jurisdictional determination by issuing the shoreline permits. Ecology took enforcement action under such jurisdiction. Despite the County's determination, Twin Bridge chose to ignore Ecology's enforcement authority in favor of its own interpretation that the County building permits somehow revoked Ecology's enforcement authority.
¶ 74 Twin Bridge claims, and the majority now holds, that Twin Bridge was entitled to rely on its own interpretation of Ecology's authority to enforce the SMA after jurisdiction had been conferred, and that Ecology must appeal that interpretation in order to defend such authority. Such a procedure totally contradicts the jurisdiction allocation under the SMA by subordinating Ecology's authority to Twin Bridge's own determination not to comply with Ecology's orders.
III. Samuel's Furniture Does Not Affect Ecology's Independent Authority to Enforce the SMA
¶ 75 The majority relies on this court's decision in Samuel's Furniture to infer that the County-issued building permits constituted a land use decision and therefore limited Ecology's enforcement action to filing a LUPA petition. In Samuel's Furniture, this court held that Ecology must file a LUPA petition in order to challenge a local government's determination that a development project did not fall within the jurisdictional boundaries of the SMA. The issue in Samuel's Furniture dealt with a determination of jurisdiction under the SMA, not solely the decision to issue a local building permit.
¶ 76 In Samuel's Furniture, the city created a shoreline management plan (SMP) that *1069 designated certain property outside the jurisdiction of the SMA. 147 Wash.2d at 444, 54 P.3d 1194. Ecology approved the city's SMP. Id.; and see RCW 90.58.090. Pursuant to this jurisdictional determination, the city issued local building permits for a project on that property without issuing a shoreline permit. 147 Wash.2d at 444, 54 P.3d 1194. Ecology then informed the developer that the city had erroneously failed to include the property within its SMP and that the development project would require a shoreline permit. Id. at 445, 54 P.3d 1194. The city expressly disagreed with Ecology's opinion and allowed the development to continue without a shoreline permit. Id. at 445-46, 54 P.3d 1194. When Ecology threatened to enforce the SMA, the developer sought a declaratory judgment that Ecology could challenge the city's jurisdictional determination only through a LUPA petition. Id. at 446-47, 54 P.3d 1194.
¶ 77 This court agreed with the developer and determined that the issuance of a local building permit necessarily required a determination that the project fell outside of the SMA's jurisdictional boundaries. Id. at 451, 54 P.3d 1194. The court concluded that the jurisdictional decision by the city constituted a final land use action for purposes of LUPA.
¶ 78 Interestingly, the court conflated the distinction between the decision to issue the permits and the original decision to approve the SMP. Id. at 451 n. 11, 54 P.3d 1194. The court did note, however, that the real jurisdictional decision was made at the time the city approved the SMP. "[E]ven if the two decisions were distinct and Ecology now concedes that the City's initial determination that the project was outside the shoreline jurisdiction was a decision subject to appeal, then it was required to appeal that decision within 21 days." Id. Regardless of which decision triggered LUPA's limitation period, it is clear that the building permits were relevant in that case only to the extent that they related to the jurisdictional decision by the city. See id. at 451, 54 P.3d 1194 ("Ecology could have challenged the issuance of those permits on the basis that they are inconsistent with the SMA because no substantial development permit was issued.").
¶ 79 Unlike Samuel's Furniture, the County's building permits in this case did not imply a jurisdictional decision regarding the SMA. In fact, the County's decision to issue the initial shoreline permits invoked Ecology's jurisdiction to enforce those permits. RCW 90.58.210. The subsequently issued local building permits did not revoke or alter the County's initial determination that the SMA governed the development project. The County continued to process the new shoreline permit application after it reissued the building permits.
¶ 80 The mere issuance of local building permits does not subordinate the independent obligation created under the SMA to obtain a shoreline permit. The provisions of the SMA expressly do not affect any locally created requirement to obtain any permit or license. RCW 90.58.360. Conversely, any local permit or licensing requirements do not obviate the permit requirement created by the SMA. As Ecology and local governments have independent enforcement jurisdiction of the SMA, the County's decision to issue the local building permits did not affect Ecology's enforcement of the SMA's permit requirement.
¶ 81 The Samuel's Furniture court went on to recognize that LUPA specifically does not affect Ecology's independent enforcement jurisdiction under RCW 90.58.210. The court assured that requiring Ecology to appeal a local government's jurisdictional decision under LUPA would not prevent Ecology "from taking action against a party who completely ignores the shoreline permitting process or one who obtains a permit and then proceeds to violate the conditions of the permit." 147 Wash.2d at 456, 54 P.3d 1194. Therefore, the court determined that LUPA would not apply when Ecology took action to enforce the SMA against a party, such as Twin Bridge, who failed to obtain a new permit.
¶ 82 The court explained that Ecology's authority to issue penalties for such a violation first required a determination that Ecology had jurisdiction under the SMA. Id. at 457, 54 P.3d 1194. When a local government has made a final decision that the SMA has no jurisdiction, only then would Ecology have *1070 to file a LUPA petition before exercising its enforcement authority. Id. On the other hand, if a local government invoked Ecology's jurisdiction by issuing a shoreline permit, then Ecology could directly proceed to take action under its enforcement authority. See id. at 456, 54 P.3d 1194.
¶ 83 Quite apart from the reasoning in Samuel's Furniture, the majority now establishes a rule that would require Ecology to file a petition in superior court before it could take any enforcement action against a party, even when the local government has determined that the SMA applies. I believe such a rule does not follow from. Samuel's Furniture and impermissibly infringes on Ecology's independent enforcement authority under the SMA.
¶ 84 In this case the Board determined that the County-issued building permits did not prohibit Ecology from directly ordering Twin Bridge to comply with the shoreline permits and affirmed Ecology's orders and penalties. I would affirm the Board's decision.
WE CONCUR: CHAMBERS and MADSEN, JJ.
NOTES
[1] Facts taken from Division One of the Court of Appeals, Twin Bridge Marine Park LLC v. Dep't of Ecology, 130 Wash.App. 730, 125 P.3d 155 (2005).
[2] The permits were marked as both substantial development and conditional use permits when originally granted. The Board, at Ecology's urging, believed that the permits were primarily conditional use permits. See Dept of Ecology Opening Br. at App. A. The superior court's decision determined that these permits were actually primarily substantial development permits. See Clerk's Papers (CP) at 427-34 (Skagit County Superior Court findings of fact and conclusions of law). The superior court's additional findings of fact and conclusions of law are properly before this court, and after reviewing the record, we accept its characterization of the permits. See RCW 34.05.562. The superior court accepted new evidence not presented to the Board, including Twin Bridge's final substantial development permit issued by the County.
[3] "Ecology did not appeal either the original issuance of Building Permits Nos. 99-1065 and 99-1226 or their reinstatement by the County on February 12, 2001, or any site work approval by the County with respect to the project, or any other County approval, decision, or action with respect to the Twin Bridge project." CP at 429, Finding of Fact (FF) 11.
[4] The agreement said in relevant part:

1. Ecology hereby withdraws its Penalty Order No. 00SEANR-1209 issued to Ken Youngsman [Twin Bridge] on or about June 21, 2000, subject to the following conditions:
a. Mr. Youngsman shall continue to pursue in good faith his application for a new Shoreline Substantial Development Permit for the Twin Bridge Marine Park.
b. In the event that Skagit County issues a Substantial Development Permit to Mr. Youngsman or his associates, Ecology reserves the right to appeal the permit to the Shorelines Hearings Board and to raise any issue therein.
c. Mr. Youngsman, his associates, and contractors shall not resume work on the site until all required federal, state and local permits have been obtained.
AR Ex. R-80.
[5] "By its issuance of Building Permits Nos. 99-1065 and 99-1226 and the EIS Addendum dated March 7, 2000, Skagit County [1 authorized construction of the Twin Bridge Marina, being developed by Twin Bridge Marine Park, LLC [1, deciding that the two then-existing Shoreline Substantial Development Permits on that property were adequate to allow the approved construction." CP at 428, FF 5.
[6] Ecology no longer argues an additional permit is required.
[7] RCW 34.05.562 provides that the superior court may receive evidence in addition to that in the agency record if it relates to the validity of the agency action at the time it was taken and is needed to decide disputed issues regarding: w (1) improper constitution as a decision-making body or grounds for disqualification of those taking the agency action; (2) unlawfulness of procedure or of decision-making process; or (3) material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.
[8] "Any permit for a variance or a conditional use by local government under approved master programs must be submitted to the department for its approval or disapproval." RCW 90.58.140(10).
[9] The trial court concluded the County-issued permits were primarily of the substantial development. The SMA generally requires conditional use permits for shoreline activities that are not developments or activities otherwise outside of the SMA. Clam Shacks of Am., Inc. v. Skagit County, 109 Wash.2d 91, 743 P.2d 265 (1987) (aquaculture company can be required to obtain a conditional use permit, even though its business is not substantial enough to be classified as a "development" or "substantial development" under the SMA). Contrary to the catch-all purpose of a conditional use permit, the "substantial development" permit is explicitly required if a development has a total cost or fair market value exceeding $5,000, or any development that materially interferes with the normal public use of the water or shorelines of the State. Former RCW 90.58.030(3)(e) (1996). Here, the two permits issued by the County were for a business endeavor that clearly exceeded the minimum substantial development requirement.
[10] RCW 90.58.140(8) provides Ecology with an avenue to appeal any substantial development permit it deems improvidently granted:

Any permit may, after a hearing with adequate notice to the permittee and the public, be rescinded by the issuing authority upon the finding that a permittee has not complied with conditions of a permit. If the department is of the opinion that noncompliance exists, the department shall provide written notice to the local government and the permittee. If the department is of the opinion that the noncompliance continues to exist thirty days after the date of the notice, and the local government has taken no action to rescind the permit, the department may petition the hearings board for a rescission of the permit upon written notice of the petition to the local government and the permittee if the request by the department is made to the hearings board within fifteen days of the termination of the thirty-day notice to the local government.
[11] Obviously, a marina is different use than dredging, but a dry marina has much less shoreline impact than a traditional marina, and part of the original permit was classified under the marina portion of the SMP.
[12] We recognize that due to the large volume of building permits issued throughout the state, Ecology can file a LUPA challenge only if it has reasonable notice. In the current case, the city of Anacortes filed a LUPA challenge and invited Ecology to join. Disregarding the proper notice, Ecology chose not to join the LUPA challenge.
[13] Superior court letter opinion:

Skagit County's determination that no new or revised shoreline permit was necessary led to its issuance of building permits for the project and lifting of a previous notice of suspension (A-2). The issuance of building permits and the lifting of the suspension are final decisions reviewable under LUPA. They are not decisions that are subject to review by a quasi-judicial body such as the SHB [Shorelines Hearings Board] and thus are not exempt from LUPA. (SHB has authority to hear appeals only on decisions to grant, deny, or rescind a substantial development permit).
CP at 425.
[14] We agree with one statement in the dissent when it says: "A party cannot decide for itself who may assert jurisdiction over it." Dissent at 1067. But neither may an agency create for itself jurisdiction to levy fines. Only the legislature may do that. The legislature, through the SMA, did not allow Ecology to levy fines once the County has decided a development is in compliance.
[15] The reinstatement of the permitswhich necessarily decided the construction complied with the SMAwas a final decision from which Ecology could appeal under LUPA. Once it received the reinstatement decision, Ecology had 21 days to appeal to the Shorelines Hearings Board. RCW 90.58.180(1); 140(6). After those 21 days, Ecology lost the right to administrative appeal, and County's decision was final. Ecology then had 21 days to appeal to the superior court under LUPA. RCW 36.70C.040(3). The dissent's first argumentthat there was never a final decision from which Ecology could appealincorrectly focuses on the original issuance of the permits. It is, instead, the permit reinstatement that was the final decision.
[16] Under the SMA's provisions, Ecology can (1) review and approve or disprove variance and conditional use permits; (2) appeal a decision granting, denying, or rescinding a shoreline substantial developmental permit to the Board; and (3) issue penalties if a party fails to conform to the terms of a permit issued under the SMA or undertakes development without obtaining the proper permit. RCW 90.58.140(10) .180(2), .210(2), (3). Here, the permits were not conditional use or variance permits and the local permitting authority determined the development did conform to the SMA and SMP.
[17] Ecology did not recognize the county building permits as authorizing the marina development. It issued a second penalty of $17,000 and also reinstated the first penalty of $17,000. Twin Bridge completed construction on the marina pursuant to the County-issued building permits, received approval for its occupancy limit from the County, and opened for business. Ecology then issued a third penalty against Twin Bridge for $25,000 and ordered the marina to cease and desist all operations until a new shoreline permit authorizing use and construction of the marina was obtained.
[1] CUP/SDP 7-82 authorized the placement of 90,000 cubic yards of landfill, development and operation of a marine dredging and construction business, and the storage of construction materials and equipment. Ecology approved permit 7-82 in a letter which stated, in part, that "[a]ny other substantial development on the site such as buildings, shore structures, hard surfacing, and drainage improvements will be submitted as a new permit or a revision to this permit pursuant to WAC 173-14-064." Ex. R-4.
[2] CUP/SDP 15-86 authorized hydraulic dredging of 40,000 cubic yards of material with upland disposal on site for the creation of a boat basin for the moorage of the developer's dredging and construction equipment. This permit was revised in 1998 to accommodate a reconfiguration of the moorage basin.
[3] Although these permits were initially labeled as conditional use/substantial development permits, the superior court later determined that they were actually substantial development permits. I, like the majority, accept the superior court's characterization of the permits.
[4] The majority characterizes the City's challenge as a LUPA appeal. Majority at 1052. However, as the dissent asserts, this is incorrect because the appeal was to a local hearing examiner pursuant to the county code. Dissent at 1051 n. 1.
[5] Part of the settlement was an agreement to vacate the hearing examiner's decision that a new substantial development permit was required.
[6] The majority's statement of the facts implies that the County issued a new substantial development permit before Ecology issued the second penalty. Majority at 1053. Although Twin Bridge applied for a new substantial development permit on July 1, 2000, under protest, the new permit was not issued by the County until April 2003. Ecology assessed the penalties in question in 2001. Ecology determined that the proposed development no longer violated the SMA after Twin Bridge received the new substantial development permit in 2003.
[7] A substantial development permit must be obtained, when required by the SMA, before such development may be authorized by the local government. See RCW 90.58.140(2) ("[a] substantial development shall not be undertaken on shorelines of the state without first obtaining a permit"); .140(5) (permit system established by the local government must ensure "that construction pursuant to a [substantial development] permit will not begin or be authorized until twenty-one days" after the substantial development permit decision is filed (emphasis added)). Thus, the issuance of a substantial development permit, when required, must precede the issuance of a building permit. Consequently, the fact that an application for a substantial development permit was pending with the County when it reinstated the building permits is irrelevant.
[8] The dollar threshold of former RCW 90.58.030(3)(e) was amended to $5,000 by Laws of 2002, chapter 230, section 2.
[9] The majority argues that. "Ecology could not have a `better' opinion on whether the expanded project would harm the ecosystem or even enough record for an informed opinion" and that "[i]t is counterintuitive that a dry-storage facility would have more shoreline impact than a water marina." Majority at 1055. The propriety and relevance of these statements is questionable. The question in this case is whether the new developments proposed by Twin Bridge were within the scope of the original substantial development permits or whether new or revised permits were required. A substantial development is "any development of which the total cost or fair market value exceeds two thousand five hundred dollars." Former RCW 90.58.030(3)(e). A revised permit is "required whenever the applicant proposes substantive changes to the design, terms or conditions of a project from that which is approved in the permit. Changes are substantive if they materially alter the project in a manner that relates to its conformance to the terms and conditions of the permit, the master program and/or the policies and provisions of chapter 90.58 RCW." Former WAC 173-27-100. A local government may approve a' revision if it "determines that the proposed changes are within the scope and intent of the original permit, and are consistent with the applicable master program and the act." Former WAC 173-27-100(1). One of the factors in determining the scope, among six others, is whether there will be an adverse environmental impact by the revision. Former WAC 173-27-100(2)(f). Thus, the issue of the environmental impact of a proposed development is an element that the local government would consider in granting a revision to the original substantial development permit. However, "[i]f the proposed change constitutes substantial development then a new permit is required." Former WAC 173-27-100(3). Ecology would not need to consider any environmental impact statements to know if the cost or value of the proposed changes in development would exceed $2,500. Thus, I disagree with the majority that the County's determination of whether a new substantial development permit was required was superior to Ecology's assessment of the proposed developments.
[10] The majority reasons that because "a conditional permit was never required, then Twin Bridge cannot be held in violation of the [Skagit County Shoreline Master Plan] or the SMA." Majority at 1055. This reasoning is nonsensical because the majority previously accepted the superior court's characterization of the permits as substantial development permits. Id. at 1052 n. 2. If a new or revised substantial development permit was required by the SMA, as asserted by Ecology, Twin Bridge could have been violating both the SMP and the SMA. The provisions of the SMP laid out by the majority do not address the question of whether a new substantial development permit was required. See id. at 1055.
[11] The dissent asserts that "[o]nly the decision of whether to issue the shoreline permit could be a final determination by the County that Twin Bridge had fully complied with the SMA." Dissent at 1066. However, if a substantial development permit is not required, then the issuance of a building permit would be a final determination that the proposed development complied with the SMA. If the County believed that the development was within the scope of the previous substantial development permit, there would be no need for a developer to apply for an additional substantial development permit,
[12] The majority notes that Ecology cannot issue fines for complying with a valid county shoreline permit. Majority at 1054. However, the majority fails to note that the SMA explicitly grants Ecology the power to enforce the SMA, including the power to issue penalties. RCW 90,58.210(1) (the attorney general "shall bring such injunctive, declaratory, or other actions as are necessary to insure that no uses are made of the shorelines of the state in conflict with the provisions and programs of this chapter"); .210(3)-(4) (Ecology may penalize developers who violate the SMA). We recognized this joint enforcement authority in Samuel's Furniture. 147 Wash.2d at 449, 54 P.3d 1194.
[13] The majority misidentifies the issue in this case when it asserts that Ecology lacks plenary power over a county's decision to issue a substantial development permit. Majority at 1055. In this case, Ecology never challenged the issuance of a substantial development permit; it merely asserted that it was enforcing the terms of the original substantial development permits. Furthermore, if Ecology disagrees with the issuance of a substantial development permit, it can appeal to the Shorelines Hearings Board pursuant to RCW 90.58.180. The majority incorrectly identifies RCW 90.58.140(8), which governs a petition for a rescission of a substantial development permit, as the appeals process. Majority at 1055 n. 10.
[14] WAC 173-27-280 details the instances where Ecology may penalize a developer independently or jointly with the local government.
[15] I disagree with the majority's contention that only the County can determine whether a substantial development permit is required. Majority at 1058. The County has the sole authority to administer the substantial development permit system. RCW 90.58.140(3). Ecology cannot directly review the local government's decisions. Samuel's Furniture, 147 Wash.2d at 454, 54 P.3d 1194. However, Ecology may penalize a person who develops a shoreline without a permit or where development violates the terms of a permit. Id. at 457, 54 P.3d 1194; RCW 90.58.210(2). Implicit in this power to penalize is the ability to determine whether the SMA requires a substantial development permit, but only when the development in question has not been authorized by a local authority.
[16] Ecology warned Twin Bridge's predecessor-in-interest that a new or revised substantial development permit would be required for developments beyond the scope of CUP/SDP 7-82. The notice given regarding the approval of permit 7-82 was more like an advisory opinion than an enforcement action. The notice was not a notice of correction within the scope of RCW 90.58.210. Furthermore, if permit 7-82 was a substantial development permit, as the majority has concluded, Ecology's approval was not required. See RCW 90.58.140(10). The notice merely informed Twin Bridge's predecessor of the requirements of the lawany substantial development on the site would require either a new permit or a revision. Thus, contrary to the dissent's argument, dissent at 1067, the notification had no legally binding effect and it did not begin the enforcement process.
[17] The majority asserts that Ecology is required to comply with LUPA when it "has reasonable notice of a final land use decision by the local permitting authority." Majority at 1051. I agree that Ecology can comply with the time constraints of LUPA only if it has reasonable notice of a land use decision. Id. at 1056 n. 12, However, the current SMA statutory scheme provides no assurance that Ecology will receive actual notice of the issuance of a building permit, even though such a permit includes an implicit determination regarding the need for and compliance with a substantial development permit. See Samuel's Furniture, 147 Wash.2d at 462, 54 P.3d 1194. If Ecology demands specific notice of the issuance of a building permit, its "remedy is to change the system through legislative action or administrative rule making." Id. at 463, 54 P.3d 1194. Consequently, Ecology must comply with LUPA regardless of whether it is given reasonable notice of the issuance of a building permit.
[18] When a local government grants, denies, or rescinds a shoreline permit, Ecology may appeal the permit decision to the Shorelines Hearings Board. RCW 90.58,180(2). Land use decisions that are subject to review by the Shorelines Hearings Board are not governed by LUPA. RCW 36.70C.030. However, the Shorelines Hearings Board lacks jurisdiction over whether a substantial development permit is required, see RCW 90.58.180(1), (2), which would include an implicit decision by a local government that a substantial development permit is not required. Thus, such a land use decision is not exempt from the requirements of LUPA.
[19] The dissent confuses the concept of standing under RCW 36.70C.060(2) with what constitutes a land use decision under RCW 36.70C.020. Dissent at 1066. A decision may be final for purposes of RCW 36.70C.020 because the decision was not appealed, while a certain party may lack standing for its failure to exhaust its administrative remedies. As noted in Samuel's Furniture, "[b]ecause LUPA requires a party to exhaust its administrative options before bringing a land use petition, RCW 36.70C.060, Ecology would also have been required to appeal the City's decisions pursuant to the procedures established by the City." 147 Wash.2d at 464 n. 16, 54 P.3d 1194. Because Ecology failed to appeal the decision to the hearing examiner, it lacks standing to bring a LUPA petition. Ecology's failure to exhaust its administrative remedies does not affect the finality of the local government's decision.
[20] The dissent argues that Ecology lacked standing to file a LUPA petition until the County determined whether to grant Twin Bridge's substantial development permit application. Dissent at 1066. The issuance of the building permits was independent of the processing of the substantial development permit and constituted a final land use decision. Furthermore, the denial or approval of a substantial development permit is appealed to the Shorelines Hearings Board under the SMA, rather than LUPA. RCW 90.58.180(2).
[21] Both the majority and dissent focus on whether Twin Bridge should have relied on the County's decision to reinstate the building permits. Majority at 1057 ("Twin Bridge was justified in relying on reissue of its building permits,"); dissent at 1068 (contesting that any reliance was justifiable). However, the determining issue is not whether there was justifiable reliance by the developer, but whether LUPA precluded Ecology from penalizing Twin. Bridge after it obtained the required building permits from the County.
[1] The majority and the Court of Appeals describe the city's appeal as a LUPA challenge. See Twin Bridge Marine Park, LLC v. Dep't of Ecology, 130 Wash.App. 730, 734, 125 P.3d 155 (2005). Such a characterization of the city's action is problematic as LUPA requires an aggrieved party to file a petition in superior court, not with an administrative body. RCW 36.70C.040. The hearing examiner had jurisdiction over the city's claim under the county code, not LUPA.
[2] Apparently, the hearing examiner vacated its decision on procedural grounds. Clerk's Papers (CP) at 404.
[3] The majority repeatedly draws attention to the fact that Ecology no longer argues that Twin Bridge is in violation of the SMA. Ecology conceded that Twin Bridge is currently in compliance with the SMA because the County ultimately approved the shoreline permit. The County's decision to approve the shoreline permit finally determined Twin Bridge's compliance with the SMA. A LUPA petition would have been prematurely filed before the County made that decision.
[4] When Ecology approved permit 7-82, it notified Twin Bridge's predecessor that,

"It is our understanding that this permit only authorizes 90,000 cubic yards of fill to be placed on site and subsequent use of the site for the operation of a marine construction and dredging business to include storage of materials and equipment. Any `other substantial development on the site such as buildings, shore structures, hard surfacing, and drainage improvements will be submitted as a new permit or a revision to this permit pursuant to WAC 173-14-064."
Twin Bridge, 130 Wash.App. at 733, 125 P.3d 155. The other permit, 15-86, permitting dredging of 40,000 cubic yards, was later amended in regard to the reconfiguration of a marine basin. CP at 10. The permits did not include any buildings, utilities, paving, or public access. Id. Ecology approved the permits as conditional use permits. While the majority concludes that the permits were later determined to be substantial use permits, and therefore did not require Ecology's approval, such a determination does not affect the notice Twin Bridge received.
[5] While the majority summarily rejects as "counterintuitive" any assessment that Twin Bridge's development of a dry-dock marina could have created a significantly different impact on the environment from the original mooring and storage site, majority at 1055-56, I am confident that the Board stands in a better position than this court to assess the environmental impact of such projects. Even the Court of Appeals recognized that the changed use constituted "a more ambitious development of [the] property as a marina." Twin Bridge, 130 Wash.App. at 734, 125 P.3d 155.
[6] The good faith requirement obviously contemplated that Twin Bridge would not resume construction unless and until the County granted, denied, or rescinded Twin Bridge's application.
[7] While submitting its application for the new shoreline permit under protest, Twin Bridge specifically requested the County "to review and act upon the application as promptly as possible." Administrative R. at Ex. R-53 (emphasis added).